UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | |
| | : | |
| v. | : | Criminal No. 21-CR-00392-3(RCL) |
| | : | |
| ERIK WARNER, | : | |
| Defendant. | : | |

DEFENDANT'S MOTION TO SUPPRESS STATEMENTS AND EVIDENCE

COMES NOW Kira Anne West, counsel for Mr. Erik Warner  in

the above captioned case, and moves for the suppression of certain oral

and written statements and evidence in the above case and in support

states the following:

I.      Procedural Background

On January 5th, 2021,[1] Mr. Warner traveled to Washington, D.C.

with three friends to attend the "Stop the Steal" rally on January 6th,

2021, where Donald Trump was the featured speaker. After the speech,

the group eventually followed the crowd to the Capitol grounds. Mr.

---

[1] The four friends attended a rally the evening of January 5, 2021  in anticipation of Antifa rioting in the streets. Mr. Warner told the agents this in his recorded statement when asked why he would wear a chest plate on January 6. Mr. Warner said Antifa was well known for stabbing people. This recorded statement, exhibit 4 can be uploaded for the Court as an exhibit because of its large size. Undersigned counsel will confer with the government and the Court's courtroom deputy so this can be done.

Warner was separated from his friends and followed others into the
Capitol. He went in, after others, through a broken window at what is
commonly known as the Senate wing doors. After looking around for a
minute, he exited the building. After the event, he drove home, with his
friends. He did not post anything on social media after January 6, 2021.
He was later arrested pursuant to an arrest warrant on June 10, 2021 in
the Central District of California.  He made his initial appearance in this
Court via VTC on June 14, 2021 where he was represented by an
assistant federal public defender in California and  entered a plea of not
guilty to the indictment charging him with various felonies and
misdemeanors related to his activities on January 6.  Magistrate Judge
Faruqui  released  him on his own personal recognizance.  *See* minute
order, June 14, 2021 & ECF No. 15.

    Mr. Warner was improperly induced to make certain statements to
law enforcement when the search of his house and person was done on
February 19, 2021.  He made these statements while under arrest in the
absence of counsel and without being mirandized.  Two superseding
indictments were later filed charging him with  conspiracy to obstruct an

official proceeding in violation of 18 U.S.C. § 1512(k);   Obstruction of

an official proceeding and aiding and abetting in violation of  to 18

U.S.C. §1512(c)(2) & (2);   Knowingly Entering or Remaining and

disorderly conduct in any Restricted Building or Grounds Without

Lawful Authority pursuant to 18 U.S.C. §1752(a)(1), (a)(2) (a)(4); and

tampering with documents in in violation of  to 18 U.S.C. §1512(c)(1).[2]

Mr. Warner moves to suppress all statements made by him to

officers and agents on February 19, 2021.  The basis for suppression is

1. Non-compliance with the requirements of warning of constitutional

rights when Mr. Warner was in custody and waiver thereof preceding

custodial questioning,  and 2.  the presence of a coercive atmosphere

created by police custody and interrogation which resulted in

undermining the privilege against compelled self-incrimination. He also

challenges the taking and subsequent search of his cellular phone and

other items from his home as the warrants were without probable cause

and overbroad.

---

[2] These are counts 1,2,5,6 & 8 of the second superseding indictment.

II.    Facts

On January 19th, 2021, at around 6 a.m.,  Mr. Warner and his wife heard flash bangs outside their home in the area of the back porch. Mr. Warner put pants on as his wife went to be with their teenage son. There were at least twenty swat officers with guns drawn pointing toward Mr. Warner.  They broke down the entrance  door to  his garage and the fence gate on the side of his house.  Multiple agents were in the front and the back of the house. When Mr. Warner opened the door, the agents told Mr. Warner they had search warrants for his person, residence and vehicles.[3] Tactical vehicles such as armored cars sat in the front of Mr. Warner's home. He was immediately handcuffed and marched  outside at gunpoint. They also marched his wife and son out the door and made them put their hands up above their heads. They put Mr. Warner in an empty, windowless van with a circle on the floor of the van with a thick metal lip that you can chain people to, much like the prisoner vans used at Guantanamo Bay. They left him in there for about

---

[3] These search warrants, obtained are filed under seal simultaneously with this motion, Exhibits 1 & 2, along with all other search warrants mentioned in this motion.

15 minutes. Then, still handcuffed,  they took Mr. Warner back inside his home and put him on the couch in the living room. He was handcuffed the entire time. Meanwhile, several agents started to roam around his home. They brought with them  an investigative team and a female agent to take pictures. Then, as if out of central casting, an aggressive type police officer came in. He was large, tall and menacing. He was wearing a desert shawl. There were several different types of police officers in the home by now, but this person stood out, even for California". Mr. Warner asked him why so many different kinds of officers were there, and this agent bent down slowly, got very close to Mr. Warner's face and whispered to Mr. Warner "because we are the joint terrorism task force." Mr. Warner was never read his rights. He was told by Agent Johnson and other agents that the officers had warrants for his home, his car and his person. They then proceeded to question him for two hours. He signed for the items they took, s*ee* exhibit 3, signed inventory, but never was presented with any kind of  consent form. All statements from February 19, 2021, should be suppressed. All evidence with the possible exception of the clothing he wore on January 6, 2021

should be suppressed. Nearly a year later, on January 31, 2022, the FBI applied for and received search warrants for Mr. Warner's two i-phones.

## III.   The Search Warrants

### A. The phone warrants & argument, 22-MJ 00054 and 22-MJ 00053

On January 31, 2022, almost a year after Mr. Warner was placed in custody and searched at his home, the FBI obtained two telephone warrants, Exhibits 5 & 6, to search phones taken from Mr. Warner's home. (The application and affidavit combine the phones for all four defendants). With regard to Mr. Warner's phone, the warrant asks for:

"A digital image copy of SUBJECT DEVICE 3, which is a black iPhone in a clear Otterbox case without visible identifiers on it, seized from a bedroom nightstand in the residence of ERIK SCOTT WARNER…."

In the list of what the agents are looking for, there is no date restriction on what they can search at all. The warrant allows a search of the entire phone for years and years. On page ix, the Court sets out the procedure that must be followed when searching the phone. They just applied for and received a warrant for the entire phone and its contents. As far as probable cause to search the phone, the affiant states:

Through my training and experience with the FBI, I am familiar with the methods of operation that individuals associated with *domestic and foreign terrorist organizations* employ – including their use of social media and online platforms such as Facebook, Instagram, and YouTube – to

communicate with associates regarding their ideology, to
organize actions on behalf of their organizations, and to bring
attention to their political and social agendas.

The agent here has made an assumption that Mr. Warner is a domestic

terrorist and must be treated as such.  There is no evidence that Mr. Warner is part

of any domestic terrorist organization.  The affiant stated that agents had manually

searched the phone, but not with forensic tools such that they could retrieve all

evidence that they believed was on the phones. *See* Exhibit 5, p. 14/289, warrant

for black and red i-phones. In the section on probable cause specific to Mr.

Warner, the affiant states that there were pictures on ABC News of a person he

believed to be Mr. Warner in the Capitol. *Id.* at p. 29/289.[4] That's it-not that he

used a phone or was seen with a phone,  or used his phone to commit the charged

crimes in the warrant which is what the agent needs to show the Court for probable

cause.

This is particularly important because the affiant further states that agents

had already completed a "manual" review of the phone yet there is nothing in the

affidavit from this manual review that shows Mr. Warner used his phone to

commit any of the crimes listed in the warrant or that something on the phone

during the manual inspection gave rise to probable cause. Photos of the four

---

[4] On page 30 the affiant describes Mr. Warner as " breaking into the Capitol" which is patently false. He climbed
through a broken window after several other had gone in ahead of him. Mr. Warner did not break  into the Capitol.
Undersigned counsel is well aware of

defendants in this case in the warrant affidavit, such as the one on page 35/289,

shows Mr. Warner without a cell phone. In an effort to bootstrap others behavior

onto Mr. Warner, the affiant states the following as probable cause for the search

of Mr. Warner's phone:

49. In this case, for example, each of the SUBJECT PERSONS
took photographs or videos of himself and others at or near the
Capitol, and smart phones are, in my training and experience,
the single most common way in which people now photograph and
film themselves. In several instances, the photo and video
files were then uploaded and published to social media. As
detailed below, in my training and experience, social media
applications are downloaded onto smart phones so that users can
upload photos and videos – such as those that were taken during
the Capitol Riots - and communicate with other users. *Id.* at 38/289.

Here, the agent fails to specify what photos Mr. Warner took on J6, if any.

The agent also fails to enumerate any communications on January 6, 2021 with

others that show he used his phone as an instrumentality of the crimes alleged in

the warrant. And in his recitation of evidence found during the manual search of

his phones, the agent simply says this:

b. In connection with search warrant 21-MJ-96
(attached hereto as Exhibit B), which authorized a search of
WARNER's residence, SUBJECT DEVICE 2 was found in the living
room. A digital image copy was created and stored in the FBI's
files but the image copy was not searched with digital forensic
tools. A manual review of this device found evidence that fell
within the scope of Attachment B of the warrant.)., and

c. In connection with search warrant 21-MJ-96
(attached hereto as Exhibit B), which authorized a search of
WARNER's residence, SUBJECT DEVICE 3 was found on a nightstand
in a bedroom. A digital image copy was created and stored in
the FBI's files but the image copy was not searched with digital
forensic tools. A manual review of this device found evidence

that that fell within the scope of Attachment B of the warrant.

Again, the agent fails to state with particularity what if anything he found in the manual search of either cell phone that was taken such that there would be probable cause to search the phone further, if at all.  The phone itself is not intrinsic or important to the crimes charged. This is just a way for the government to collect evidence without adhering to the constitutional process of evidence gathering. This flies in the face of the holding in *Riley v. California*: police must have a warrant in the absence of consent. And the warrant contemplated in Riley did not allow for forced biometric use. *See* argument, *infra*.

B. <u>Search warrant for Warner's home & truck, 21-MJ -00097</u>

FBI agents applied for and received a search warrant for Mr. Warner's home and truck, and unbelievably, even his wife's vehicle.  In the agent's affidavit on probable cause for searching two vehicles at Mr. Warner's residence, Agent Johnson states that Warner "drove from Riverside County to Washington, D.C. to participate in the riot." *See* p. 6, paragraph 6, warrant 21-MJ-00097, Exhibit 2, This is false. Mr. Warner was interviewed by the FBI on February 19, 2021, wherein Mr. Warner stated that he came to Washington, D.C. to attend the "stop the steal" rally because he believed the election was stolen. The agent presses on and references a photo "of an unknown individual" on page 10 of this affidavit that has nothing to do with any of the defendants, and includes several pages of facts

about other J6 actors that have nothing to do with any of the defendants. Without

explaining what his "training and experience" is, he states, and swears under oath,

that "I know that militia extremists sometimes call themselves three

percenters…."*See* footnote 2, p. 15, agent's affidavit, Ex. 2. One has to wonder,

what "training and experience" Special Agent Johnson has with any three

percenters before January 6, 2021. He doesn't tell the Magistrate Judge in his

affidavit what he did before becoming an FBI special agent in 2017.  The agent

goes on in paragraph 45 and again states that "each of the SUBJECT PERSONS

took photographs or videos of himself and others at or near the Capitol…" yet

again does not state with any specificity any photo Mr. Warner took. Or that he

used his phone at all. Page 35 mentions a defendant named "Saley." Defendant

Warner has no idea who this is. But most alarming is that the agent requests and is

given permission to execute the warrant using biometric data. His affidavit states:

> c. Thus, the warrant I am applying for would permit
> law enforcement personnel to, with respect to any device that
> appears to have a biometric sensor and falls within the scope of
> the warrant: (1) depress SALEY'S thumbs and/or fingers on the
> device(s);and (2) hold the device(s) in front of SALEY'S face
> with her eyes open to activate the facial-,iris-, and/or retina-
> recognition feature. *Id.* at p. 35, Exhibit 2.

First of all, the biometric language is for a defendant named "Saley." So this

should be excised from the warrant. Obviously the Magistrate Judge was not

reading this warrant carefully. She didn't even know the name of the defendant.

Moreover, there is no evidence  or even an allegation in the affidavit that Mr.

Warner ever impeded or injured a police officer as stated on the face of the warrant

or that he even knew Congress was voting in the Capitol that day.

The affidavit asks to seize, among other things:

"any digital device which is capable of containing and reasonably could contain evidence, information, or instrumentalities as described in the search warrant affidavit and above, hereinafter the "Device(s)." *See* Application for  Warrant  at p. xv & Attachment B attached as Exhibit 2.[5]

In the affidavit, the affiant stated that, sometime after January 6, 2021, law-enforcement agents developed evidence indicating that Mr. Warner was present at the United States Capitol on January 6, 2021.         The affiant indicated only that Mr. Warner was in the Capitol, not that he had used his phone in any way.

## IV.   The Law:

### A. Statements

The Supreme Court has determined that the Fifth and Fourteenth

Amendment's prohibition against compelled self-incrimination requires

that custodial interrogation be preceded by advice to the Defendant that

he has the right to remain silent and the right to the presence of an

attorney. *Miranda v. Arizona*, 384 U.S. 436, 479 (1966). Miranda

warnings are required before custodial interrogation begins. *Id*. at 444-

45.  Before it can use any statements produced through custodial

interrogation, the government has the burden to show that "the defendant

---

[5] The warrant and application and affidavit is filed under seal.

'voluntarily, knowingly and intelligently' waived [these] rights." *J.D.B. v. North Carolina*, 564 U.S. 261, 269-70 (2011). A custodial interrogation is questioning initiated by law enforcement officers after a person has been taken into custody *or otherwise deprived of his freedom of action in any significant way. Illinois v. Perkins*, 496 U.S. 292, 296 (1990)(emphasis added). To determine whether or not a person is in custody, one must examine the objective circumstances of interrogation, not the subjective views harbored by either the interrogating officers or the person being questioned. *Stansbury v. California*, 511 U.S. 318, 323, (1994). The Court must look to how a reasonable man in the suspect's position would have understood the situation. *Id., quoting Berkemer v. McCarty,* 468 U.S. 420, 442 (1984). Moreover, the Government must show the statements were obtained without coercion or improper inducement. *Colorado v. Connolly*, 479 U.S. 157 (1986).

Should a defendant make a statement, a court must examine the voluntariness of the particular statement and test whether the statement was freely given under the totality of the circumstances. *Schneckloth v. Bustamonte*, 412 U.S. 218, 226 (1973); *see also, Malloy v. Hogan*, 378

U.S. 1, 6- 7 (1964) (the constitutional inquiry is not whether the conduct of the law enforcement officers in obtaining the confession was shocking, but whether the confession was free and voluntary); *Culombe v. Connecticut*, 367 U.S. 568, 602 (1961). The government bears the burden of proving by a preponderance of the evidence that a statement allegedly made by a defendant was voluntary, or fits into exceptions to this general rule. *Lego v. Twomey*, 404 U.S. 477, 489 (1972); *United States v. Garcia*, 780 F. Supp. 166, 171 (S.D.N.Y. 1991). However, Miranda does not apply "[i]f the defendant is not in custody … nor do[es][it] govern other non-interrogative types of interactions between the defendant and the State." *Montejo v. Louisiana*, 556 U.S. 778 (2009). Without a valid Miranda waiver, the police may not ask questions, even during booking, that are designed to elicit incriminatory admissions. *Pennsylvania v. Muniz,* 496 U.S. 582, 601-02 & n. 14. Accordingly, the questioning here by law enforcement officers did serve to elicit incriminatory admissions.   The government bears the burden to demonstrate a knowing and intelligent waiver of the privilege against self-incrimination when a defendant raises a colorable claim of coercion.

*See Miranda* 384 U.S. at 475; 18 U.S.C. § 3501(b) (setting forth criteria for determining when a confession is "voluntary" or "coerced.") And when determining voluntariness of a statement, the "totality of the circumstances" must be examined, including the defendants individual characteristics and background, the setting in which the statement occurred, and the details of the interrogation or interview. *United States v. Elie*, 111 F. 3d 1135, 1143-44, (4th Cir. 1997); *United States v. Pelton*, 835 F.2d 1067, 1071-72 (4th Cir. 1987). *Accord United States v. Van Metre*, 150 F 3d 339, 348-49 (4th Cir. 1998).

B. **The Law on Searches of things -No Particularized Probable Cause**

The Warrant Clause of the Fourth Amendment commands that "no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized." U.S. Const. amend. IV. "These words are precise and clear." *Stanford v. Texas*, 379 U.S. 476, 481 (1965). And through their creation of the dual constitutional mandates of probable cause and particularity, the words of the Warrant Clause are meant to deny police the ability "to rummage at will" through a

person's private matters. *See Arizona v. Gant*, 556 U.S. 332, 345 (2009); *see also Coolidge v. New Hampshire*, 403 U.S. 443, 467 (1971). Biometric language in a search warrant flies in the face of a defendant's 5th amendment right against self-incrimination. *See In re the search of a resident of Oakland, California,* 354 F. Supp. 3d 1010 (N.D. Cal. 2019; *Cf.  In re Search of [Redacted]* D.C., 317 F. Supp. 3d 523, 540 (D.D.C. 2018) (holding that the compelled use of a suspect's biometric features was nontestimonial).

A judge considering an application for a search warrant must determine whether, in light of all of the circumstances described in the supporting affidavit, "there is a fair probability that contraband or evidence of a crime will be found in a particular place." *Illinois v. Gates*, 462 U.S. 213, 238 (1983). The affidavit thus "must demonstrate cause to believe" not only that an item of evidence "is likely to be found at the place to be searched," but also that there is "a nexus between the item to be seized and [the] criminal behavior" under investigation. *United States v. Griffith*, 867 F.3d 1265, 1271 (D.C. Cir. 2017) (quoting *Groh v. Ramirez*, 540 U.S. 551, 568 (2004).

A judge's decision to issue a search warrant, moreover, may not be "a mere ratification of the bare conclusions of others." *Gates*, 462 U.S. at 239. Rather, an affidavit submitted in support of a warrant application must provide the judge "a substantial basis for determining the existence of probable cause" — *i.e.*, it must

supply "[s]efficient information" to enable the judge to make independent findings on the necessary elements of the probable cause standard. *Id*. Only in that way can the judge "perform his 'neutral and detached' function and not serve merely as a rubber stamp for the police." *Aguilar v. Texas*, 378 U.S. 108, 111 (1964) (quoting *Johnson v. United States*, 333 U.S. 10, 14 (1948)).

The "particularized facts" and circumstances that must be set forth in the affidavit are essential to the judge's finding of "a fair probability that evidence of a crime will be located on the premises of the proposed search," *id.* (internal quotation marks omitted), and "form the central basis of the [judge's independent] probable cause determination," *United States v. Underwood*, 725 F.3d 1076, 1081 (9th Cir. 2013), thereby ensuring that any search authorized by a warrant "will be carefully tailored to its justifications, and will not take on the character of the wide-ranging exploratory searches the Framers intended to prohibit," *Maryland v. Garrison*, 480 U.S. 79, 84 (1987).

By contrast, an affidavit that states only "suspicions, beliefs, or conclusions, without providing some underlying factual circumstances regarding veracity, reliability, and basis of knowledge, is a 'bare bones' affidavit, and fails to establish probable cause." *United States v. West*, 520 F.3d 604, 610 (6th Cir. 2008) (internal quotation marks omitted).

The particularity requirement — that a warrant "set out with particularity" the "scope of the authorized search," *Kentucky v. King*, 563 U.S. 452, 459 (2011) — "is closely tied to the requirement of probable cause," *Griffith*, 867 F.3d at 1275 (quoting 2 Wayne R. LaFave, *Search & Seizure* § 3.7(a) (5th ed. 2016)). It constrains law enforcement by "prevent[ing] the seizure of one thing under a warrant describing another," *Marron v. United States*, 275 U.S. 192, 196 (1927), and avoids the issuance of search warrants "on loose, vague[,] or doubtful bases of fact," *Go-Bart Importing Co. v. United States*, 282 U.S. 344, 357 (1931).

Generally speaking, in order to make out probable cause for a warrant to conduct a search, law enforcement officers seeking the warrant must establish that "there is a fair probability that contraband or evidence of a crime will be found in [the] particular place [to be searched]." *Illinois v. Gates*, 462 U.S. 213, 238 (1983). Having probable cause to believe that a person has committed a crime does not mean that there is probable cause to search his effects. *See Steagald v. United States*, 451 U.S. 204, 212-213 (1981); *see also United States v. Griffith,* 867 F.3d 1265, 1271 (D.C. Cir. 2017) ("probable cause to arrest a person will not itself justify a warrant to search his property"). In order to establish probable cause for a search, a nexus must be shown to exist between the item to be searched and the criminal activity under investigation. *Warden, Md. Penitentiary v.*

*Hayden,* 387 U.S. 294, 307 (1967); *Groh v. Ramirez*, 540 U.S. 551, 568 (2004).

This nexus flows with the fact that the "manifest purpose of th[e] [Fourth

Amendment's] particularity requirement was to prevent general searches."

*Maryland v. Garrison*, 480 U.S. 79, 84 (1987).

 Indeed, the Fourth Amendment's particularity requirement is to

"ensure that [a] search will be carefully tailored to its justifications, and will not

take the character of the wide-ranging exploratory searches the Framers intended to

prohibit." *Id.* With regard to what the Fourth Amendment's particularity

requirement means in the context of searches of cell phones, *Riley v. California,*

573 U.S. 373 (2014) is instructive. In *Riley*, the Supreme Court held that, when

police officers making an arrest locate a cell phone on the arrestee's person, they

"must generally secure a warrant before conducting… a search [of that phone]." *Id.*

at 386. In reaching this holding, the Court recognized that it was creating an

exception to the rule that police may normally conduct a warrantless search

incident to arrest of an arrestee's person and any property on his

person. *Id.* at 381-86. In *Riley*, the Court recognized that warrantless searches

incident to arrest are ordinarily considered reasonable under the Fourth

Amendment. For one thing, this is because the police need to be able to search an

arrestee's person and any property on his person to see if he has evidence on him

so that they can prevent its destruction or concealment. *Id.* at 383 (*citing Chimel v.*

*California,* 395 U.S. 752, 762-63

(1969)). On this point, the Court specifically discussed *United States v. Robinson*,

414 U.S. 218 (1973). *Riley*, 573 U.S at 383-84.

In *Riley*, the Court found that the rule announced in Robinson was not

applicable where the property found on the arrestee's person is a cell phone. *Riley*,

573 U.S. at 385-86. Where the property at issue is a cell phone, the police cannot

just search the cell phone to see if it might contain evidence of criminal activity. If

they want to search the phone, they must get a warrant. This is because a search of

a cell phone implicates privacy rights in an extraordinary way. *See Riley*, 134 S.Ct.

at 384-401.

In *Riley*, the Court pointed out that, unlike most physical objects, "[c]ell

phones place vast quantities of personal information literally in the hand of

individuals." *Riley,* 573 U.S. at 386. The Court pointed out that saying that the

search of a cell phone is materially indistinguishable from the search of any other

physical item is "like saying a ride on horseback is materially indistinguishable

from a flight to the moon." *Id*. at 393. The Court elaborated that cell phones are in

fact "minicomputers" and, in addition to being used to make phone calls, can also

be used as "cameras, video players, rolodexes, calendars, tape recorders, libraries,

diaries, albums, televisions, maps or newspapers." *Id*. Indeed, the Court noted that "the sum of an individual's private life can be reconstructed" from the data on his cell phone." *Id*. at 394. It is important to stress here that, in *Riley*, the Court specifically distinguished a search of a cell phone from a search of records:

"there is an element of pervasiveness that characterizes cell phones but not physical records." *Id*. at 395. In fact, the Court went on to note, "[A] cell phone search would typically expose to the government far more than the most exhaustive search of a house." *Id*. at 396 (emphasis in original).

The Court then went on to say that allowing police officers to search a cell phone incident to arrest is like allowing police officers who "find[] a key in a suspect's pocket... to unlock and search [his] house." *Id.*In order for the warrant to properly authorize the search of cell phones found in a suspect's home, it must be based on an affidavit that provides probable cause for believing that there is a particular cell phone in the residence that does in fact contain evidence of criminal activity. That this is the case is confirmed by the holdings in *Griffith*, 867 F.3d 1265.

In *Griffith,* the Court for Appeals for the District of Columbia Circuit held that, given the Fourth Amendment's particularity requirement, a warrant to search a suspect's residence for any cell phones that might be found there will not be valid

unless the affidavit submitted with the application for that warrant shows 1) that the suspect does in fact own a cell phone, 2) that that cell phone is likely to be found in his residence, and 3) that that cell phone would contain incriminating evidence about his suspected offense. 867 F.3d at 1273. In *Griffith*, the Court found that the warrant at issue there was invalid because, just as an initial matter, the affidavit failed to even establish that the suspect did in fact own a cell phone. *Id.* at 1272-73. Additionally, the Court noted that the warrant allowed for the police to seize all electronic devices, including cell phones, found in the residence regardless of who owned those devices. *Id.* at 1275-76. The Court held that this "overbreadth" in the warrant also did not comport with the Fourth Amendment's particularity requirement. *Id.* at 1275. The Court indicated that the warrant should have been limited to only those devices owned by the suspect or those linked to the crime that he was suspected of being involved in. *Id.*

V.      Argument

A. Statements: "You're not under arrest."

The government cannot meet its burden of showing that defendant's statement and consent to search his phone was knowing and voluntary under the totality of the circumstances. The government will argue that because agent Johnson told Mr. Warner at the outset that

"you're not under arrest" that Mr. Warner's statements were voluntary.

Not so when the totality of the circumstances is considered by this

Court. Special Agent Johnson began questioning the defendant

immediately after a team of more than 20 swat team members broke into

his house with flash bangs. He was handcuffed. Agents were questioning

his wife and bullying her. His teenage son was witnessing it all. They

told Mr. Warner before they questioned him that they were also

searching the other three defendants homes at the same time. They wore

guns and tactical gear. They pointed their guns at him and his family.

They asked for the passcode for his phone and he gave it to them

willingly. Mr. Warner did not believe he had a choice.  No warning was

given before Warner did this.   This  consent  was not voluntary, and if

the Court finds it was, it's only voluntary with regard to January 6

activities and did not include anything outside that scope. See

*Commonwealth v. Gallagher*, No. 1529 WDA 2019, 2021 PA Super 204

(2021) (en banc). Besides, Mr. Warner was never told he would be

charged with a crime.

   B. <u>Items within the home and vehicles</u>

In this case, the warrant authorized a wide-ranging exploratory, no holds barred search of all electronic devices in Mr. Warner's home regardless of who used or owned those devices and regardless of their linkage to his criminal activity. Already, the warrant's overbreadth and analysis under *Griffith* rendered it invalid. Beyond this, the warrant also allowed the law enforcement agents to search any digital devices including computers and cell phones found in Mr. Warner's home as part of this wide-ranging exploratory search of all electronic devices in the home.        Moreover, it did so based on an affidavit that provided no specific reason for thinking that there was a particular cell phone in Mr. Warner's home, that he used the phone in the commission of a crime, or  that would contain evidence related to the crimes he was suspected of being involved in. There was no evidence at the time of the execution of the search warrant that he posted anything or texted any photos, used a phone or had one with him at on J6, which is in direct contravention to almost every other J6 defendant.  Given all this, the cell phones that  were found in Mr. Warner's home were searched without there being the necessary showing of particularized probable cause that they did in fact contain data that has evidentiary value.

The affidavit provided no specific reason for thinking that there was a particular cell phone in Mr. Warner's home that would in fact contain evidence related to the crimes that he was suspected of. Especially in light of *Riley,* it cannot be credibly

claimed that the Affidavit provided the judicial officer who signed the warrant with a "substantial basis for determining the existence of probable cause" to search any and all cell phones found in the home, nor can it be credibly claimed that it was objectively reasonable for the law-enforcement agents executing the warrant to have relied on it to search any and all cell phones they just happened to find in the home. *See Griffith*, 867 F.3d at 1279 (because warrant was not based on probable cause to believe that a cell phone with incriminating evidence on it would be found in the residence and because the warrant permitted the search of all electronic devices found in the residence regardless of who owned them, the government could not rely on the *Leon* good-faith exception to prevent application of the exclusionary rule). Beyond this, it cannot be credibly claimed that, to the extent the judicial officer who signed the warrant allowed law-enforcement agents to search any and all cell phones found in Mr. Warner's home as part of a wide-ranging exploratory search of all electronic devices in the home, he/she was properly exercising independent legal judgment, nor can it be denied that his probable-cause determination in regards to the search of any cell phones that might be found in Mr. Warner's home reflected an improper analysis of the totality of the circumstances.

Because the search of the  cell phone allegedly found in Mr. Warner's home

was conducted in violation of his Fourth Amendment rights and because the

government cannot rely on the Leon good-faith exception to avoid application of

the exclusionary rule to the data obtained from those phones, that data must be

suppressed.  There was also no probable cause listed for Mr. Warner's vehicles. He

didn't even take his own vehicle to Washington, D.C. and agents knew when they

applied for this warrant that another co-defendant rented a vehicle that was driven

to D.C. Agents also took a computer and Mr. Warner's son's go-pros which have

absolutely no nexus to January 6th and further shows the breadth and extreme width

of this warrant. Additionally, any evidence and information derived from

exploitation of that data must also be suppressed. *See Wong Sun v. United States*,

371 U.S. 471 (1973).

Accordingly, the search of the phone and computer violated Mr. Warner's

Fourth and Fifth Amendment rights. Not only that, the seizure of the biometric data

has to fail because it is for some other person other than Mr. Warner.[6]

Respectfully, the defendant  moves this Honorable Court to

suppress the data obtained by law-enforcement agents from the search of his cell

phone that was found in his home and any evidence and information derived from

---

[6] Undersigned counsel cannot figure out why the warrants were amended so she asked the government and they have provided a response.

exploitation of that data. The defendant also moves for suppression of any other article or clothing and items not specifically connected to the events of January 6, 2021 in the application to the search warrant, and the defendant moves to suppress his statement made to law enforcement.

WHEREFORE, Defendant prays this Honorable Court will set this motion down for pretrial evidentiary hearing, order the government to have all agents and police officers involved in the case preserve their rough notes regarding these issues, and thereafter order suppression of evidence and statements.

Respectfully submitted,

_____/s/ *Kira West*_____
Kira Anne West
DC Bar No. 993523
712 H. Street N.E., Unit 509
Washington, D.C. 20002
(202)-236-2042
kiraannewest@gmail.com
Attorney for Mr. Erik Warner

26

<u>Certificate of Service</u>

I certify that a copy of the forgoing was filed electronically for all parties of record
on this 9th day of June, 2023.

_____/s/____*Kira West*_____
Kira Anne West
Attorney for Mr. Erik Warner