## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| | : | |
| **v.** | : | |
| | : | **Case No. 21-CR-00392(RCL)** |
| **ERIC WARNER,** | : | |
| | : | |
| **Defendant.** | : | |

### DEFENDANT'S SENTENCING MEMORANDUM

*And all Israel heard of the judgment which the king had rendered; and they feared the king; for they saw that the wisdom of God was in him to administer justice.  1 Kings 3:28.*

*Introduction*

Erik Warner was invited to come to DC to hear the President of the United States speak on January 6, 2021. As this Court heard during the trial, the road trip to hear the President speak turned into an unmanageable mob and riot.[1] Mr. Warner ought to be sentenced for his conduct and his conduct alone-not the conduct of the other defendants.[2] Mr. Warner holds himself accountable for his actions on January 6, 2021.

*Going into the Capitol*

He knew that going into the Capitol was wrong, which is why he was only there  for  less than 3 minutes.  Going to the Capitol was something he did out of

---

[1] Much like the movie the Hangover, Mr. Warner found himself in a very bad situation that went from bad to worse in short order. Unlike the movie, there is no happy ending here.
[2] Only the most relevant facts will be repeated since the Court heard the trial.

1

his own volition for his own reasons; once he went in however, he realized he was now a part of something he did not intend. That is, he entered at 2:14 p.m. and exited at 2:16:51 p.m. This behavior is not First Amendment protected speech. Once he realized his mistake, he and passed others trying to enter at the same time. If this was a man who wanted to be a part of this mob, he would have continued farther inside, but he did not. He moved against the flow to exit – and that speaks volumes as to his intent.    Figure 1.



*Figure 1*

Mr. Warner was a follower, not a leader. Mr. Warner was not there to stop a vote or to interfere with anyone; that was never his intention. He simply went to DC to see the President speak. The FBI 302 of his interview states "[h]e only stated he and the others were not there to hurt Congress people or overthrow the

government." He understands that his bad, split- second decision to enter the Capitol deserves to be punished for what it was.

*Punishment for conduct of others*

He also should not be punished for firearms that others brought that he knew nothing about. There is no evidence that Mr. Warner knew of these firearms before the road trip. Not even after the road trip began.[3]  Mr. Warner should not be punished for decisions and/or violence perpetrated by other people. He did not engage in violence at any point on January 6th.  Nor did he steal or damage property that day, unlike many others in the crowd.  He wore the exact same clothes that he'd worn for years when skating in California. He carried the exact

---

[3] During Mr. Warner's two hour interview with the FBI, he told the agents that he knew Kinnison and Martinez had concealed carry permits and that it would be legal for them to carry.

same flag that he'd carried for years in California.  Neither were tactical or military

grade or designed as such.



*Figure 2*

4

*Bear Spray*

Photos and evidence show he carried a bear spray cannister that he found on the grounds of the Capitol, and strapped to his bag.  He threw it away while walking away from Capitol grounds. He had no intention of using it. Figure 3



*Figure 3*

The court will recall that Officer Mendoza of the USCP testified it was legal to carry bear spray in DC.  Moreover, the government had no proof at trial that the bear spray was ever used by Warner or was even operable at any time while in Warner's possession. When this Court considers that Mr. Warner spent time during Covid -19 not only volunteering to be a  triage nurse in New York City  and then seeing the rioting and looting during the George Floyd protests all over America, picking up a discarded can of bear spray and carrying it can be seen as a defensive

act, not an offensive act.  Additionally, Warner's credible fear that Antifa would be present on January 6th and attempt to attack or hurt Trump supporters indicates a motive to protect himself and others.

*Looking for buddies*

The Court will recall that after Mr. Warner's 3 minutes inside the Capitol, he wandered aimlessly around Capitol grounds and stood around trying to use his cell phone to find his friends.  As widely reported after the event, cell service on January 6th was overwhelmed and this created large areas around the Capitol where people had no signal or non-functional connections.

https://www.pcmag.com/opinions/why-cell-networks-cut-out-at-the-us-capitol-riot.

Mr. Warner can be seen on CCTV surveillance video trying to get a signal to

connect to his phone by holding it up and standing around at the highest spots.

Clearly, his intent was to find his buddies.



*Figure 4*



*Figure 5*

He was part of a crowd, that by their mere presence, overwhelmed the police. The crowd overwhelmed the police. But it should be considered that while others filed into the tunnel that day to fight with police and try to gain entrance further into the building, Mr. Warner did not. He left while others were trying

desperately to enter.   He had the opportunity to join people in the tunnel, he stayed

well away from the violence. Figure 6.



*Figure 6*

Ultimately, a better path would have been to leave the grounds altogether

once he saw what was going on outside, but he did not. That was his choice – and

he takes responsibility for that choice - to look for his friends after they were

separated rather than leave. Hindsight makes the best decision seem so obvious,

but in real time, you don't always make the best decision because the best decision

is not readily apparent until it's all said and done. Furthermore, just because Mr.

Warner did not make the best decision, does not mean that he made the wrong

decision. The evidence shows he  was actively not participating in violence and

was just trying to find his friends. He's a marine; you don't leave a soldier behind. In the chaos of the day, he wanted to make sure they were ok[4]

Remarkably, Mr. Warner did not post any social media on that day or any day thereafter. He was afraid he would lose his job, which he ultimately did just two days after January 6. He knew on January 7, 2021, the day after the riot on his way home that his job was in jeopardy. On January 7, 2021, colleagues from his job called and said they saw him on television.  What's critically missing from the evidence in this case is that Mr. Warner never says or texts or emails anyone that says he was there to stop the vote, knew a vote was taking place or that he ever contemplated obstruction of the Electoral College Certification.  In fact, it was never established at trial that Mr. Warner had the intent to interfere with the certification at all.[5]

Yet here he is, a non-violent, hard-working American - someone the government will argue before this Court should go to federal prison for more than the guidelines suggest. For example, lawyers-lawyers who work for the FBI, that lie on applications for FISA warrants for political reasons, are not sentenced to

---

[4] Mr. Warner was honest with the probation officer about his bad conduct discharge from the Marines.  If his conduct back then occurred in 2021 instead of years  ago, Mr. Warner would have been put into some type of  drug counseling program and been able to keep his job. It's even legal now to smoke marijuana and stay in the military.
[5] After the events of January 6th, Mr. Warner did nothing but keep quiet and mind his own business in stark contrast to many other J6'rs whom this Court has sentenced. He didn't go on Tucker Carlson or any other show, even though he had the opportunity to do so.  Most importantly, he never will.

prison-they get probation. *See USA v. Kevin Clinesmith*, 20-CR-165 (JEB).[6]   Mr.

Clinesmith walked out of federal courtroom in this courthouse a free man without

spending a day in prison. That's a disparity the size of Texas. That's not to suggest

that this honorable Court should therefore give Mr. Warner a sentence of

probation. No, no, no. What it says is that Mr. Warner should be punished for his

conduct when taking into account all the facts of his particular conduct and no one

else's.

OBJECTIONS TO THE PSR

After carefully reviewing the PSR with Mr. Warner, the defense filed certain

objections with the probation officer.

**A.** Mr. Warner made an objection to paragraph 96 of the PSR. *See* USSG
§2J1.2(b)(3).

Mr. Warner never had an elaborate plan to go to the Stop the Steal rally.

Instead, he was a passive member of a "text chain" in which members of the group

were discussing going.[7]   Notably, on the days leading up to January 6, he did not

send any text messages indicating that he was planning to engage in any

conspiracy. Nor did he send any messages indicating that he was planning to

---

[6] Our system of law needs to address this anger which our legal system is not really set up to address. The only people upset about the FBI lawyer getting probation were other lawyers. But when J6 defendants are sentenced it seems the whole world is watching.

[7] This is just like joining a facebook group. Judy from North Carolina may be planting 100 daffodils and ask Sally from Virginia how to do it but it doesn't mean Suzie from Colorado read that message even though she's in the group.

obstruct Congress.  He planned to go when he was invited by others. Mr. Warner

did not do any of the preparation or planning of this trip.

Finally, even if the Court finds that Mr. Warner planned to go to the rally (as

did thousands of Americans), *planning to go to the rally is not planning to commit

a crime (conspiracy) which involves extensive planning*—which is his offense of

conviction. Indeed, there is absolutely no evidence in the record that he pre-planned

to hinder Congress in any way.  For these reasons  the two-level enhancement under

does not apply.

**B.** Paragraph 76 of PSR. He did willfully obstruct or impede the administration of
justice, nor did he attempt to conceal his involvement in the instant offense by
deleting the DC Brigade Telegram chat from his phone. A two level adjustment
pursuant to USSG 3C1.1 is not warranted here. He not delete the information on
his phone because of pending prosecution.

In  *United States v. Malki,* 609 F.3d 503, 511 (2d Cir. 2010), is illustrative of

the kind of case in which a Court gives the enhancement.  In *Malki*, a case

involving treason and espionage, the Court upheld the enhancement because the

defendant was "deleting cell phone records just before he was interviewed by

Government agents, deleting emails after such interviews, falsely claiming to the

District Court that he had taken documents from TQ by accident whereas he had

stolen documents after leaving TQ, and representing to the Court that he had no

criminal record when in fact there is a warrant outstanding in Massachusetts

charging him with disorderly conduct, resisting arrest, and assaulting

12

a police officer in 1997. The *Malki* case does not apply because when Mr. Warner deleted the items on his phone (which were later found by the FBI) he had no idea he would be interviewed by the FBI or charged and he didn't delete anything after the interview. In *United States v. Ruballo*, a money laundering/wire fraud case, the defendant was destroying evidence during the execution of a search warrant and "only a fraction of the [deleted ] material was recovered." 833 Fed. Appx 275, 280 (11th Cir. 2020). The defendant also shredded key evidence after the defendant learned the investigation was in full swing. *Id.* Neither of these cases come close to the conduct here which happened within hours of January 6th and as Mrs. Warner testified at trial, it was because the family shares an i-cloud account.

**C.** Paragraph 103: See USSG §4C1.1(a)(7).

The probation officer states in her report that Mr. Warner "transported firearms in connection" with the instant offense. What does it mean for something to be "in connection" with an offense? There are too many assumptions at play here for this guideline to apply. It would be one thing if they all conspired to rob a bank and then brought guns and used them to scare people during the commission of the crime. But here, Mr. Warner did not possess or transport any firearms. The government has to prove that the guns played an integral role in the offense Mr. Warner committed and there is not even any evidence that anyone brought a gun to

DC or wanted to. And furthermore, it was in the character of the two other

defendants to carry these guns because it is there 2nd amendment right to have them

and they both had concealed carry permits. It's not like these two defendants just

bought these guns for their trip to DC for this specific occasion. These two

defendants bring guns everywhere.  These people value their own protection.

These guns played no role in this crime. Independent of these two other

defendants, that  this somehow affects Mr. Warner is non-sensical.

**D.** 2 point reduction under 4C1.1

      Mr. Warner is a perfect candidate for the two point offense level reduction

(zero point offender adjustment) recently promulgated by the U.S. Sentencing

Commission under 4C1.1.[8] Mr. Warner objects to not being given this two level

---

[8] The defendant must meet all of the following criteria to qualify for the 2-level reduction:

1. the defendant has not received any criminal history points;

2. the defendant has not received an adjustment for terrorism (covered by § 3A1.4);

3. the defendant did not use violence or credible threats of violence in connection with the offense;

4. the offense did not result in death or serious bodily injury;

5. the offense of conviction is not a sex offense;

6. the defendant did not personally cause substantial financial hardship (to be determined independently of the application of § 2B1.1(b)(c));

7. the defendant did not possess, receive, purchase, transport, transfer, sell, or otherwise dispose of a firearm or other dangerous weapon (or induce another participant to do so) in connection with the offense;

8. the offense of conviction is not an offense involving individual rights (covered by § 2H1.1);

lower adjustment under the guidelines. This of course depends on the Court's ruling on the firearm adjustment under subsection (a)(7). As described *supra,* Mr. Warner meets all of these criteria.

**E.** Paragraph 185:

There is no evidence in this case that Mr. Warner by his actions engaged in intimidation or coercion, or retaliated against government officials or function.  18 USC § 2332b(g)(5)(B). Most importantly, 1512(k) is not listed as one of the enumerated offense.

For the reasons set forth herein, Mr. Warner requests that this Honorable Court  impose a sentence within the guidelines range of 27-33 months, two years supervised release,  60  hours of community service and $2,000 restitution to account for:

1. His lack of preparation or planning prior to January 6, 2021 to be part of the Capitol breach and his peaceful, non-destructive and non-violent behavior that day both outside and inside the Capitol building, and his sincere remorse in this regard;

---

9. the defendant did not receive an adjustment under § 3A1.1 (hate crime motivation or vulnerable victim) or § 3A1.5 (serious human rights offense); and,

10. the defendant did not receive an adjustment under § 3B1.1 (aggravating role) and was not engaged in a continuing criminal enterprise.

2.      His lack of bragging or posting on social media about what happened January 6;

3.      His amazing commitment to his community, his family and his church;

4.      His long history of a strong work ethic which has allowed him to be a productive  and positive member of society;

5.      The fact that he lost his job and has had his nursing license revoked from the state of California; and

6.      That there is a pending civil case against Mr. Warner which he has to defend which will bankrupt him.

## I.      **Background**

Mr. Warner is a father, husband and son. He graduated from  high school in Texas,  and lived in Paris, also in Texas. He then moved to California when he was 20. PSR Paragraph 117.  He has been married only once and is the proud father of a 17 year old son who will be a senior in high school next year.[9] Mr. Warner was asked by Mr. Kinnison to go on a road trip to DC to see President Trump speak. He walked in and out of the building alone, he did not cause any damage, nor did he engage in any violence. He was not encouraging others to protest or to commit

---

[9] Mr. & Mrs. Warner have been incredible parents. Their son is being recruited academically by UCLA, Harvard, Yale, the University of Chicago and Northwestern. How the University of Texas has missed this young man is a mystery.

violence.   He was inside the Capitol for approximately 3 minutes.  Additionally,

Mr. Warner gave the FBI his phone and cooperated with them before getting a

lawyer by giving them a 2 hour statement. He even told them he would be

available for further interviews if needed.[10] When this Court considers  and

compares the behavior of other J6 defendants the Court will find that  Mr. Warner

was cooperative and has been cooperative since the beginning of this investigation.

He voluntarily spoke to the FBI when they arrested him and gave a detailed

statement of the offense in which he admitted that he entered the U.S. Capitol

building. He also gave them the password to his iPhone for easy investigation.

## II.   California protests and Antifa spurned Mr. Warner to action as Antifa was at  Trump rallies to hurt old ladies and people there to support Trump.

This Court can only understand why Mr. Warner came from California with

his friends to D.C. to attend the Trump Rally by taking into account the enormous

influence the President, the media, and the lack of accurate and truthful

information played in the months leading up to January 6, 2021 and thereafter.

There is absolutely no evidence in this case to indicate he had plans to enter the

Capitol, to stop the vote,  or commit any violence that day.  There is evidence,

however, that Mr. Warner became interested in political speech and assembly

when mask mandates rolled through California, shutting down schools and the

---

[10] This information is taken directly from the FBI 302 of Warner's interview.

economy.  He attended rallies such as "Recall Gavin Newsome" and protests and experienced, first hand in California, the counter-protesters involved in ANTIFA. He saw old ladies and elderly people harassed at rallies for expressing their reasonable disagreement with draconian mask policies that Mr. Warner felt hurt his family, his kid and his community.

Mr. Warner also watched the events of 2020 unfold on television in places all over our country.  He was aware of ANTIFA coming to Trump rallies both before and after the election stirring up trouble and injuring people present to exercise First Amendment Free Speech.  For example, in November 2020 Trump supporters were beaten in the streets of Black Lives Matter Plaza  in D.C. by Anti-Trump demonstrators that day.  *See* Figure 7, Getty Images photo, Roberto Schmidt.



TOPSHOT-US-POLITICS-VOTE-RALLY

TOPSHOT - A supporter of US President Donald Trump lying on the floor is kicked as he is attacked by anti-Trump demonstrators in Black Lives Matter Plaza in Washington, DC on November 14, 2020. (Photo by Roberto SCHMIDT / AFP) (Photo by ROBERTO SCHMIDT/AFP via Getty Images)

*Figure 7*

When Mr. Warner's friends told him about the rally at the Ellipse, he was interested in attending, not only to hear what President Trump had to say, but to make sure people would be safe to gather.  His excitement for a road trip to D.C. with his friends was caused by a notion he might actually be able to help people avoid being harassed by counter-protestors and protect old ladies and elderly people from harm.  He brought with him a medical kit and supplies which he carried with him to the Capitol on January 6 just in case and planned to use his skill as a nurse if needed.  These are not the actions of someone there to overthrow the government.

## A. **Mr. Warner's remorse**

Mr. Warner  believed that he should show his support for the soon to be former President by attending his rally scheduled for January 6, 2021, at the Ellipse on the Mall.   Mr. Warner is very upset that people died that day, that people destroyed certain areas of the Capitol, and that police officers were attacked by the crowd.   He only learned how horrible the day was  days after the fact like the rest of us.  His concern for all those that died and were injured is sincere, and as he walked to the Capitol, he had no idea that the result would be what it was.  His 2 hour interview to police during the search warrant was open and honest.[11]  The FBI agents that wrote this report never stated that he was in any way insincere or lying about the facts. He never once refused to answer their questions.

His cousin made that meme weeks after J6 and sent it to not only Mr. Warner but others.  His cousin's behavior should not be used to indicate that Mr. Warner  is not remorseful for his conduct.  He is.  He understands the gravity of this situation, his role in it.

In fact, it's important for this Court to know that Mr. Warner wanted to plead guilty a year before the trial date in this case and agreed to a plea agreement

---

[11] In determining sentencing consideration for remorse, the Courts and Guidelines consistently focus on the defendant's behavior _after_ the initiation of the criminal  case, rather than prior to a defendant's  arrest. For example, under the U.S. Sentencing Guidelines (U.S.S.G.),  sentencing level reductions for acceptance of responsibility apply to a defendant's action in pleading guilty after the initiation of the case.  U.S.S. G. § 3E1.1.   Defendants are not given a more punitive sentence under the U.S.S.G.  if they do not indicate remorse prior to filing of the initial charges.  Evidence of remorse after initiation of criminal charges  is key.  This makes sense, as it allows time for the defendant to reflect on the evidence, and his own conduct.  This encourages reflection and review, and focuses on the defendant's actions after a defendant has availed himself of his constitutional right to counsel through the initiation of the prosecution of the case.

that the Government drafted and that AUSA Mariano agreed to. It was done and agreed to by all parties. Yet when Mr. Mariano sent it up to his supervisors for approval, they said no. No reason was given, just no.[12] Again, Mr. Warner should not be held accountable for the unreasonable and inconsistent[13] actions of supervisors at the U.S. Attorney's Office.

### B.  Mr. Warner's activities inside and outside the Capitol.

For some time, police were able to fend off the crowd, but as we now know, some rioters instigated a push to overwhelm the few, undertrained, under equipped and unprepared police.[14]  By 1pm the barricades had been breached and destroyed. Thereafter, protestors made their way up the on to the Upper West Terrace and at approx..2:13 p.m., the Capitol was breached through a broken window adjacent to the Senate Wing Doors. This breach was well before Mr. Warner actually entered the Capitol and at approximately the time he would have just reached the Capitol Grounds down by the Peace Circle.  He didn't see the breach or even know it was occurring.   In fact, when he arrived, he and his friends prayed for a moment by a tree and then walked up to the West front unencumbered by barricades.

---

[12] Undersigned counsel is happy to provide emails between the parties.

[13] As this Court knows, many other J6 defendants have been given the opportunity to plead guilty to 1512 offenses.

[14] See Dmitiy Khavin, et al., Day of Rage: An In-Depth Look at How a Mob Stormed the Capitol, The New York Times (June 30, 2021), available at https://www.nytimes.com/video/us/politics/100000007606996/capitol-riot-trumpsupporters.html; see also Shelly Tan, et al., How one of America's ugliest days unraveled inside and outside the Capitol, The Washington Post (Jan. 9, 2021), available at https://www.washingtonpost.com/nation/interactive/2021/capitol-insurrection-visual-timeline/.

 By the time he made his way up to the upper terrace of the west side of the

Capitol, there was no fighting or police interaction to be seen.  No officers were

outside in the courtyard at this time and the people were standing around waving

flags and gathering by the doors.  Mr. Warner stopped to take photos facing away

from the building.  He was not aware of the people behind him smashing open the

doors or windows trying to gain entrance. However, he does not dispute that when

he walked up to the open, broken windows and saw people were entering through

them, that he followed them in.



*Figure 8*

Mr. Warner has absolutely no history of  criminal conduct or political

extremism.  He had absolutely no expectation or knowledge of the consequences of

others' actions that day, nor the consequences that their actions would have on his being present.  He was supporting the President that day, but more importantly, he was supporting everyday Americans' rights to assemble without fear of extremist counter-protesters injuring them or silencing their right to speak.

While he did not personally destroy anything, or commit violent acts, the jury found that he illegally played a part in a mob.  According to Ed Maguire, a criminologist at Arizona State University, security forces are trained to ignore yelled insults and small acts of hostility, like pushes and thrown water bottles. And they receive training in absorbing surges in a crowd, moving people as gently as possible, and quickly responding to pockets of violence and isolating agitators. Benedict Carey, Making Sense of the 'Mob' Mentality, New York Times (Jan. 12, 2021), available at  https://www.nytimes.com/2021/01/12/science/crowds-mob-psychology.html  Mr. Warner  did not commit any of those actions towards police. On January 6 there was "[n]o clear structure in the crowd and absolute chaos on the police side: no clear sense of credible incident command, of wearing the right gear, carrying the right weapons. All of that seemed to be missing." Id.

Importantly, as for persons in the mob "With no apparent structure or strategy, the crowd had no shared goal or common plan." Id.  Dr. James Jasper, a sociologist at City University of New York, noted, "Crowds do not act with one irrational mind… There are many groups, doing different things, for different

reasons." He further said, "There are great shots from the hall of statues, where protesters stayed inside the velvet ropes, like tourists, looking around sort of in awe." *Id*.

Unfortunately, Mr. Warner followed a large crowd to the Capitol rather than leave; not knowing how violent as a whole the mob would be independently of his own actions. Others who were also part of the mob, had different and more violent plans that day of which Mr. Warner is now being associated with.

## III.  LEGAL STANDARD

Section 3553 of Title 18 of the United States Code enumerates certain factors a district court is to consider when sentencing a defendant who has been convicted of a federal offense.   Primarily, the court shall consider the nature and circumstances of the offense and the history and characteristics of the defendant. *See* 18 U.S.C. § 3553(a)(1). The court shall also consider the need for the sentence imposed to: reflect the seriousness of the offense, promote respect for the law, and provide just punishment; afford adequate deterrence to criminal conduct; protect the public from further crimes of the defendant; and provide defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner. *Id.* at § 3553(a)(2)(A-D).  Section 3553(a) further sets forth the factors that the Court must consider in fulfilling this provision.[15]

---

[15] 1.     The nature and circumstances of the offense and the history and characteristics of the defendant;

# IV.  FACTORS CONSIDERED PURSUANT TO 18 U.S.C. §3553(a)

At sentencing, a district court must impose a sentence that is "sufficient, but not greater than necessary" in light of the factors identified in §3553(a).   *United States v. Mendoza-Mendoza*,  597 F.3d 212, 216 (4th Cir. 2010), *citing Kimbrough v. United States*, 552 U.S. 85, 111 (2007)(quoting §3553(a)).

## A. Nature & circumstances of the Offense & the History and Characteristics of Mr. Warner

As the attached letters indicate, Mr. Warner is hardworking, kind, generous and law abiding. *See* Exhibit 1, letters. First, the defense is not aware of any evidence that defendant's entry into the Capitol was violent in any way.  Second, he did not attempt to add to the violence of the mob. For example, he didn't chant "whose house, our house" like literally thousands of other protesters.   Third, there is no evidence that he engaged in any violence or questionable conduct towards law enforcement.  Fourth, he did not destroy or steal any property from the Capitol. Fifth, based on the Government's investigation, it appears that he remained in the Capitol building for about three minutes.

---

2.    The need for the sentence imposed;
3.     The kinds of sentences available;
4.    The kinds of sentence and the sentencing range…;
5.     Any pertinent policy statements issued by the Sentencing Commission;
6.    The need to avoid unwarranted sentencing disparities among defendants with similar records who have been found guilty of similar conduct; and
7.    The need to provide restitution to any victims of the offense.
18 U.S.C. § 3553(a)(1-7).

The government must concede that he committed no violent acts and destroyed no property, even though he was in the proximity of others committing violence. His actions within the Capitol have been tracked on the CCTV footage and this footage demonstrates that he did not destroy property or commit violent acts. He did not suit up for combat. He did not obscure his face. He was not armed. He did not yell at any police officers. He wore clothing that was not designed for J6, but that he'd had for years as a California skateboarder. By the time Mr. Warner arrived at the U.S. Capitol, the barriers that had been erected along the perimeter of the building were no longer present. This was shown at trial. He met no resistance in his walk to and inside the Capitol. At the time, he didn't dream he'd be charged for going into the Capitol.

He spoke to the officers and the FBI truthfully, freely and voluntarily when arrested. Without representation of counsel, he fully acknowledged his conduct by answering pointed questions by multiple FBI agents. He has never violated his conditions of release. He did not post anything on social media or brag to friends after January 6.

This has obviously been a tough road for Mr. Warner and his family. He has a very simple life: he worked hard as a nurse and tries at every turn to improve himself, support his family, and be a servant of God. It is of utmost importance to him that this Court understand that he is incredibly saddened and remorseful about

what took place on January 6, 2021. *See* Mr. Warner's letter, exhibit 2. People died, and law enforcement officers and protesters suffered multiple injuries. None of his actions will be erased from the internet. It's there forever.  He has been the subject of a number of media accounts lumping him with others that were violent, ruthless and well-orchestrated that were there on January 6, 2021 for violent purposes. His personal character and reputation will forever be tarnished.  He's lost the ability to work in a field that he was very good at and loved. His family receives hate mail.[16] He still has to defend against a civil case brought in federal court here  against him and others.  In sum, society has already punished him for his actions. When society is telling you what you did was bad, that's when one feels remorse. It doesn't take a long prison sentence for one to feel remorse.

In determining what punishment is warranted, this Court should not lose sight of the fact that he did no harm, intended no harm, and has lived a life with no criminal conduct.  He has been a model of good behavior on pretrial and post-trial release. His past behavior and his post arrest behavior show that he is a very productive citizen and the Court can rely on that as a basis to sentence  him  to a term of imprisonment within the guidelines and a term of supervised release of two years considering the 3553 factors.

## B. Need for the Sentence imposed

---

[16] See letter, exhibit 3.

1. **General deterrence – 18 U.S.C. § 3553(a)(2)(B) – to adequately deter others from criminal conduct**

The purposes of sentencing include punishment, rehabilitation, general deterrence, specific deterrence, and incapacitation. In this case, there appears to be no need for incapacitation, specific deterrence or rehabilitation.  He has already been severely punished as noted *supra*.  The public will be adequately deterred by the sentences meted out against those who perpetrated the violence and mayhem at the Capitol and the negative publicity and collateral consequences attendant to even a misdemeanor conviction for those involved. Those who would not be deterred by these consequences are likely not deterrable. And, a sentence that leaves a person unable to work when other reasonable alternatives exist would not promote respect for the law. Indeed, unnecessarily harsh sentences imposed upon those who were less culpable will not encourage respect for the law or promote just punishment, but are likely to  be counterproductive, and labeled as political posturing.  A sentence within the guidelines, restitution and supervised release does constitute punishment  and  it will deter others as one's liberty interests are curtailed by travel restrictions, reporting obligations, and limitations on one's personal freedoms while on supervised release. He has been on pretrial release for nearly two years  with many restrictions and has complied with them completely.

The National Institute of Justice, Department of Justice, issued a summary of the current state of empirical research stating that "prison sentences are unlikely to

deter future crime," and "increasing the severity of punishment does little to deter crime."  U.S. Dep't of Justice, Office of Justice Programs, Nat'l Inst. of Justice, *Five Things to Know About Deterrence* (July 2014) (relying on Daniel S. Nagin, *Deterrence in the Twenty-First Century*, 42 Crime & Justice in America 199 (2013)), available at https://ncjrs.gov/pdffiles1/njj/247350.pdf.

2. **Specific deterrence – 18 U.S.C. § 3553(a)(2)(C) – to protect the public from further crimes of the defendant**

 Mr. Warner's  likelihood of recidivism is really non-existent. He has expressed genuine remorse and contrition.  His acceptance of responsibility was swift, complete and without reservation and exercising one's constitutional right to go to trial should not be used against him.  Research has consistently shown that while the certainty of being caught and punished has a deterrent effect, "increases in severity of punishments do not yield significant (if any) marginal deterrent effects." Michael Tonry, *Purposes and Functions of Sentencing,* 34 Crime & Just. 1, 28 (2006)" Three National Academy of Science panels… reached that conclusion, as has every major survey of evidence." *Id*.; *See also* Zvi D. Gabbay, *Exploring the Limits of the Restorative Justice Paradigm: Restorative Justice and Sentence Severity: An Analysis of Recent Research (1999),* summary available at http://members.lycos.co.uk/lawnet/SENTENCE.PDF. The report, commissioned by the British Home Office, examined penalties in the United States as well as

several European Countries. *Id*. at 1. It examined the effects of changes to both the

certainty and severity of punishment. *Id*. While significant correlations were found

between the certainty of punishment and crime rates, the "correlations between

sentence severity and crime rates…were not sufficient to achieve statistical

significance." *Id*. at 2. The report concluded that the "studies reviewed do not

provide a basis for inferring that increasing the severity of sentences is capable of

enhancing deterrent effects." *Id*. at 1. Given his  current age, the fact that he's

married with a young son  and other issues consistent with what is mentioned

above, the likelihood that he would ever re-offend is as close to zero as one might

come.[17] A punishment in excess of the guidelines in this case is going to have the

exact opposite effect than what is in the interest of justice.  Mr. Warner urges the

Court to impose a sentence within the guidelines in light of his non-violent conduct

at the Capitol, his  immediate cooperation with the FBI, and the lack of a need to

further deter him.

### 3.  Just Punishment

Mr. Warner has a felony conviction which, in and of itself, is quite punitive.

The conviction  affects possible future job opportunities and will remain with

---

[17] For defendants in a Criminal History Category I, the recidivism rate is 15.2%. For those who have been employed, the rate is 12.7%; and for those who were ever married, the rate is 9.8%. For those with no history of illicit drug use, the recidivism rate is half those who have a drug history. *See* U.S. Sentencing Commission, *Measuring Recidivism: The Criminal History Computation of the Federal Sentencing Guidelines,* (May 2004).

him for the rest of his life.  He can't vote or carry a gun. He has to defend a

pending civil case filed in this Court. But supervised release will allow him to

continue to work and support his community and continue the volunteering he

does in his church.  If incarcerated for a long period of time, there will be only

more suffering, especially by his young teenage son.[18]

Given sentences imposed in comparative cases, a sentence within the

guidelines is not unusual and is  appropriate here. *See* Disparity, *infra*

And after one serves their time, there is supervised release to follow. This

involves significant restraints on a defendant's liberty.  Defendants must

periodically report to the probation officer, permit the officer to visit their

homes and jobs at any time, and follow the officer's rules of the road.  *Jones v.*

*Cunningham,* 371 US 236, 242 (1963).  Defendants are admonished to keep

good company and good hours, work regularly, keep away from undesirable

places, and live clean, honest, and temperate lives.  *Ibid*.  Not only must they

faithfully obey these restrictions and conditions, but they also live in constant

fear that a single deviation, however slight, might result in being sent to prison

again.  *Ibid*.

---

[18] The general consensus for years is that parents should stay home with their children when they are infants and toddlers. Now it is clear that the most important years in a child's life and when they most need their parents are when they are teenagers.

Defendants might be rearrested any time the probation officer only believes they have violated a term or condition of probation. *Ibid*. They might have to serve all of the time that was suspended with few, if any, of the procedural safeguards that normally must be provided to those charged with crime. *Ibid*. [Supervised release] significantly restrains defendants' liberty to do the things that free people in this country are entitled to do. *Ibid*.

## C. **The kinds of sentences available**

A sentence above the guidelines would result in sentencing disparity with other individuals who behaved similarly but were not similarly charged . *See infra*.

Imposition of a fine is discretionary, and, defendant respectfully submits, he cannot pay a fine in this case since his family has lost his income.

## D. **The need to avoid unwarranted sentence disparities**

If this Court were to impose a sentence greater than the guideline range, probation, community service, and/or restitution, it would create an unwarranted sentencing disparity compared to similar cases that have already gone to sentencing  or are pending in this Court.[19]  Paragraph 188 of the PSR states that the

---

[19] For example, *United States v. Reeder,* 21 CR 166 (TFH). Critically, this J6 defendant pushed police officers and made contact with them yet the government chose not to pursue those charges and he was given 3 months incarceration and allowed to keep his class B misdemeanor deal. Here's what he posted: "was there for over a half hour. I got gassed several times inside, many times outside the Capitol. Got shot with peppers balls. Its fucking nuts. We had to battle the police inside. It was crazy. Absolutely insane." *See* ECF No. 26, p.1. Later a group

median length of imprisonment of J6 defendants whose primary guideline was

2J1.2,  is  30 months. As this Court knows, each case must stand on its own facts.

---

unaffiliated with the government brought to their attention additional violent conduct by Mr. Reeder, and the government asked to continue the sentencing hearing. Ultimately, despite concrete evidence of violence, the government chose not to bring additional charges. *See* ECF No. 33; 35, exhibit 1, power point, pages 30-41. Consider the sentence imposed in *United States v. Mark Leffingwell*, 21-cr-5-ABJ (D.D.C. 2021). Leffingwell entered the Capitol Building. *Id.,* ECF No. 31, p. 2. But "Leffingwell was not content to merely stand inside the threshold": Positioned at the front of the line of rioters stacked hundreds deep behind him, Leffingwell chanted at the officers standing before him to "join us!" in the rioters' efforts to assault the Capitol. When some in the crowd shouted for the rest of the crowd to "back up," Leffingwell rebuked them, shouting "If you back up, you'll never get back in!" When U.S. Capitol Police Officers D.A and W.H tried to repel Leffingwell and the gathering crowd, Leffingwell struck both officers in the head. *Id.,* p. 2 (emphasis added). Specifically, Leffingwell "first punched Officer D.A. in the head, and then as he continued to swing, he punched Officer W.H. in the head, before eventually punching Officer D.A. once more." *Id.,* p. 8. His conduct was so brazen that he was one of the few protesters arrested on the scene. Id., p. 9. Leffingwell pled guilty to a felony offense under § 111(a)(1). *Id.* The government sought a sentence of 27 months' incarceration. Id., p. 2. The Court imposed a sentence of six months' incarceration with credit for time served, followed by 24 months of supervised release.  Mr. Warner's conduct was nowhere near this. Consider *United States v. David Blair*, 21-cr-186-CRC (D.D.C. 2021). Carrying a Confederate flag, Blair walked up to a police line outside the Capitol. He turned towards an officer and said, "What's up motherfucker, what's up, what's up bitch?" 21-cr-186, ECF No. 55, p. 8. When the officer came close to Blair, the defendant jabbed him with a lacrosse stick. Id. A search incident to arrest recovered a knife in the defendant's backpack. 21-cr-186, ECF No. 55, p. 8. Blair pled guilty to a § 231(a)(3) felony offense. This defendant was sentenced to five months' incarceration. Just as in *Leffingwell,* Blair's acts could only be interpreted as intended to inflict bodily injury or to threaten it.

These cases may be somewhat similar to Mr. Warner's conduct, yet the conduct was punished using a metric that is no longer legal after *United States v. Brock, No. 23-3045, D.C. Cir. March 1, 2024.*

Consider the Court's own cases:

\*      *United States v. Marshall Neefe, 21-CR-567 (RCL):* Neefe pleaded guilty to obstruction of justice and assault (111)(a) after coordinating and planning for weeks ahead to travel to D.C. to violently ensure that President Trump would stay in power. As part of the plan, Neefe fabricated a wooden club- which he named the "Commie Knocker"- that he carried to Capitol grounds. Once at the Capitol, he participated with others to thrust a large metal sign into a line of law enforcement. Once he broke the line, he entered the Capitol building and spent **40 minutes** inside. After January 6, through Facebook, he expressed pride about getting tear gassed and breaching the Capitol. At his sentencing, the government identified three police officer victims of his assault.[20] For all of this, he did not receive the more than minimal planning enhancement (despite having created a weapon solely for the purpose of bringing to D.C.) and was sentenced to 41 months.

\*      *United States v. Kelly*, 21-708 (RCL). The Court will recall that Mr. Kelly was in the Capitol for more than 30 minutes, went into the Senate floor, traveled to the Capitol with his parents, and rifled through papers and posed for pictures on the dias. After a jury trial, this Court sentenced him to the top of the guideline range and gave him 30 months but did not upwardly depart. This conduct if far more egregious than Mr. Warner's three minutes inside and hours looking for his friends.

---

[20] *United States v. Marshall Neefe*, 1:21CR567-RCL, ECF. No. 84, Government's Sentencing Memorandum.

\*      *United States v. Johnatakis,* 21-cr-91(RCL). An extreme case of misconduct and abusive behavior, Mr. Johnatakis was given 87 months by the Court. He recorded several videos expressing his satisfaction with what happened at the Capitol, he assaulted police officer Gonzalez, and after his trial has given speeches and podcasts from his jail cell. This Court gave him 87 months and declined to "depart upwards from the sentencing guidelines…"

Mr. Warner's   culpability appears to be minimal in contrast with rioters who posted hateful messages, destroyed or stole government property and assaulted or threatened the law enforcement officers on that date.  These cases demonstrate that the sentence requested by the government is greater than necessary. Comparing Mr. Warner's behavior to the panoply of January 6 defendants, his conduct was less serious than those who brought weapons with them and caused injury to officers. He also stands apart from many January 6 defendants in that he did not glorify or minimize his conduct after the fact. Instead, he accepted full responsibility for his conduct by  calling his boss the day after J6 and admitting his conduct, by apologizing to his wife  and son and other family members, by trying to work out a plea agreement with the government, and finally by apologizing to this Court.

**V. CONCLUSION**

We are not asking that this Court let Mr. Warner off the hook for his bad conduct. Mr. Warner respectfully moves this court to impose a sentence within the guidelines, 24 month's supervised release, 60 hours of community service, and $2,000 restitution. This sentence is "sufficient but not greater than necessary" as required by 18 U.S.C. §3553(a). It would be a sentence in the best tradition of federal judicial discretion, that would consider Mr. Warner as an individual and account for his unique failings and positive attributes that, in the words of Justice Kennedy "sometimes mitigate, sometimes magnify, the crime and the punishment to ensue." *Rita v. United States*, 551 U.S. at 364, (Stevens, J. concurring), *citing Koon v. United States*, 116 S.Ct. 2053 (1996).

Respectfully submitted,

By: _____ /s/ *Kira A. West* _____
Kira Anne West
DC Bar No. 993523
712 H. St. N.E., Unit #509
Washington, D.C. 20005
Phone: 202-236-2042
kiraannewest@gmail.com

<u>CERTIFICATE OF SERVICE</u>

I hereby certify on the 12th day of April, 2024 a copy of same was delivered to the parties of record pursuant to the rules of the Clerk of Court.

_____ *Kira West* _____ /S/
Kira Anne West